T.C. Memo. 2003-285

UNITED STATES TAX COURT

GEORGE R. AND BARBARA H. BURRUS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14709-99.                    Filed October 3, 2003.

<u>John A. Beam III</u> and <u>Eric E. Rogers</u>, for petitioners.

<u>John E. Glover</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined the following
deficiencies, addition to tax, and accuracy-related penalties
with respect to petitioners' Federal income taxes:

| Year | Deficiency | Addition to Tax and Penalties | |
| | | Sec. 6651(a)(1) | Sec. 6662 |
| --- | --- | --- | --- |
| 1990 | $48,003.74 | $2,399.77 | $9,600.75 |
| 1991 | 61,322.84 | -- | 12,264.57 |
| 1992 | 72,370.56 | -- | 14,474.11 |
| 1993 | 104,589.15 | -- | 20,917.83 |
| 1994 | 42,916.12 | -- | 8,583.22 |
| 1995 | 25,817.51 | -- | 5,163.50 |

After concessions, the issues for decision are: (1) Whether petitioners' activity relating to cattle breeding was an activity not engaged in for profit within the meaning of section 183 for the years in issue, (2) whether petitioners are liable for an addition to tax under section 6651(a)(1) in 1990, and (3) whether petitioners are liable for accuracy-related penalties under section 6662(a) for the years in issue.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, supplemental, second, and third supplemental stipulations of facts, and the attached exhibits.

At the time of filing the petition, petitioners resided in Nashville, Tennessee. Petitioners filed joint returns for the

years in issue. Petitioners' 1990 return was due, including extensions, on October 15, 1991, and was received on October 28, 1991. Petitioners' returns for the remaining years in issue were timely filed.

Petitioner George R. Burrus (Dr. Burrus) is a licensed physician. Petitioner Barbara H. Burrus (Mrs. Burrus) reported an occupation of "real estate manager" on the returns for the years in issue.

Dr. Burrus has been involved with farming, cattle, and other agricultural activities since his childhood. He had check-writing authority for his father's farm, starting as a teenager, and his active involvement continued on weekends and during the summer while attending college. Dr. Burrus has no formal education or training in animal husbandry, farming, or similar agricultural activity.

During the years in issue, Dr. Burrus maintained a successful medical practice and was chief of his department at a local hospital where he also served as the chief perfusionist. He often worked as many as 7 days a week, for as many as 10 to 12 hours per day. During the years in issue Dr. Burrus reported income from his medical practice in amounts ranging from $233,749 to $691,281.

From 1969 to 1971, Dr. Burrus served as a missionary doctor

in Africa, during which time he established a small missionary hospital that remains in operation today. Petitioners return to Africa to work at the hospital twice a year, for a month each in the spring and fall.

In 1978, Dr. Burrus entered into a partnership, the Foreman-Burrus Hereford Ranch (FBHR), with a fellow physician, Howard Foreman (Dr. Foreman), to breed purebred horned Hereford cattle. Initially, Drs. Burrus and Foreman shared FBHR's profits and losses equally.

In 1980, FBHR acquired 505 acres of property in Cheatham County, Tennessee (Cheatham Property), comprising three separate tracts of land. The Cheatham Property was purchased at $1,200 per acre for a total purchase price of $606,000. Drs. Burrus and Foreman chose this property for FBHR because of its proximity to Nashville and their medical practices.

At most times, FBHR was operated by five ranch hands and maintained up to approximately 250 animals. Cattle were bred by FBHR by means of an "embryo transfer" method, which at the time was a technique of surgically implanting embryos in cows.[1] After FBHR incurred losses for the first 5 or 6 years of its existence, Dr. Burrus became concerned that the operation could not be run

---

[1] Embryo transfer was subsequently perfected as a less expensive, nonsurgical technique.

profitably using the embryo transfer technique, so he convinced Dr. Foreman that they should adjust their profit and loss sharing ratios.  As a consequence, Dr. Burrus reduced his share of the profits and losses of FBHR to 20 percent while Dr. Foreman took an 80-percent share therein.  Dr. Burrus retained his 50-percent interest in the Cheatham Property, however.

After losses continued for several more years, Dr. Burrus became convinced that a cattle breeding venture that utilized the embryo transfer technique could not be run profitably, and as a consequence sought to terminate FBHR.  On December 26, 1989, Drs. Burrus and Foreman executed an agreement dissolving FBHR, under which the animals and equipment were distributed to the partners in the same ratio that profits and losses were shared: 80 percent to Dr. Foreman and 20 percent to Dr. Burrus.  With respect to the Cheatham Property, Dr. Burrus obtained sole ownership by paying $818,053 to Dr. Foreman for his 50-percent interest.  The partners had agreed that ownership of the Cheatham Property would be resolved by Dr. Foreman's proposing a price for a 50-percent interest based on an appraisal, and Dr. Burrus's having the option either to purchase Dr. Foreman's interest, or sell his own interest to Dr. Foreman, at that price.  Dr. Burrus chose to purchase Dr. Foreman's interest.

Dr. Burrus then commenced (in 1990) a purebred horned

Hereford cattle breeding undertaking principally at the Cheatham Property and at certain other real property owned or controlled by petitioners, referred to as the Maple Row Hereford Ranch (Maple Row). It is this undertaking that is at issue in this case. During the years in issue, the undertaking consisted primarily of breeding and selling registered horned Hereford cattle.[2] Dr. Burrus employed "natural selection" in the cattle breeding operations at Maple Row rather than the embryo transfer technique employed by FBHR, because he believed the former was more cost effective.

As noted, the Cheatham Property was the principal location for the Maple Row cattle undertaking. Petitioners also used two additional properties in Maple Row's operations, in that cattle were transported to those properties to graze during the years in issue. One such property was located in or near the town of White House, in Robertson County, Tennessee (Robertson Property), and the other was located in or near the town of Hendersonville, in Sumner County, Tennessee (Sumner Property).[3] The Robertson

---

[2] Petitioners also purchased steer for fattening during certain years, sold bull semen, and received income from leasing the tobacco allotments for the Maple Row land.

[3] From 1979 through 1989, petitioners undertook farming operations on the Robertson and the Sumner Properties that included running steer to eat the grass, selling crops, and leasing tobacco allotments. Petitioners also generated income by
                                                        (continued...)

Property contained approximately 274 acres, comprising three tracts acquired by petitioners between 1966 and 1977. Two houses were located on the Robertson Property for which petitioners received rental income during the years in issue. The Cheatham Property also had a house from which petitioners received rental income. The Sumner Property consisted of two tracts, acquired from Dr. Burrus's mother between 1975 and 1983: an approximately 51-acre tract held by the Cardiovascular Surgery Associates, P.C. Money Purchase Pension Trust[4] and an approximately 10-acre tract held by petitioners personally. Petitioners' residence during the years in issue was located in Nashville, although there was a one-bedroom apartment affixed to a barn on the Cheatham Property where petitioners or family members occasionally stayed overnight.

The Cheatham Property was purchased by FBHR in 1980 for $606,000, and sold to Dr. Burrus in late 1989 for an effective price of $1,636,106. Appraisals obtained by petitioners for purposes of trial estimated the Robertson Property's value at

---

[3](...continued)
leasing houses on the Robertson Property. On their returns, petitioners reported the results of these activities separately from the results of FBHR. Petitioners reported net losses from the farming and rental activities undertaken on these properties in those years.

[4] At some point in time, petitioners apparently transferred this tract to Dr. Burrus's sec. 401(k) plan.

$200,000 in 1990 and $400,000 in 1995, and the Sumner Property's value at $316,000 in 1990 and $700,000 in 1995.

Petitioners employed Charles Gruen, who had worked for FBHR before its dissolution, as the sole ranch hand at Maple Row from 1990 until he retired in 2000. Mr. Gruen, who had experience working with cattle for about 20 years before joining FBHR, was placed in charge of Maple Row's day-to-day operations. Dr. Burrus and Mr. Gruen communicated frequently, often daily, regarding operations at Maple Row. Mr. Gruen resided with his wife at the Cheatham Property.

Rather than selling cattle on location at the Cheatham Property, as was done by FBHR, Maple Row's livestock sales, principally purebred Hereford bulls, were made at "absolute" auctions in Montgomery, Alabama, and Orlando, Florida. Dr. Burrus did not advertise regarding Maple Row's livestock during the years in issue.

Petitioners' herd inventory records were maintained by Mr. Gruen and consisted of two parts. The first was the "Office Copy of Breeding and Calving Record", which contained information regarding the cattle in the Maple Row herd including their parentage, birth date, birth weight, and identification number that was submitted to the American Hereford Association (AHA). The second record was the "Herd Performance Enrollment", which

listed the Maple Row cattle that were registered with the AHA and their registration numbers.  Based on the herd inventory records, Maple Row's cows produced the following offspring in the years indicated:

| Year | Heifers | Bulls | Total |
|------|---------|-------|-------|
| 1990 | 13 | 6 | 19 |
| 1991 | 10 | 7 | 17 |
| 1992 | 15 | 15 | 30 |
| 1993 | 17 | 20 | 37 |
| 1994 | 27 | 24 | 51 |
| 1995 | 30 | 23 | 53 |

In 1998, two of the cows in the Maple Row herd received "Dam of Distinction" awards from the AHA for exceeding certain calf production standards as measured against other cows in the herd. One cow had produced nine calves and the other six.

Although petitioners did not have a written business plan for Maple Row, Dr. Burrus anticipated that the cattle operation would begin to show a profit once his herd reached 100 "productive"--i.e., calf-bearing--cows.  Dr. Burrus anticipated selling the male offspring at the age of 2 for approximately $2,000 each, as well as a small number of culled females while retaining the remaining females to build the herd.

The primary financial record maintained in connection with Maple Row was a ledger used to record the activity occurring in the three bank accounts petitioners maintained for the purpose of

conducting Maple Row's operations. Mrs. Burrus, who was responsible for writing checks and preparing the ledger, would generally obtain information necessary for this purpose from Dr. Burrus and Mr. Gruen. The ledger recorded the expenditures of the Maple Row operations, as well as its income, such as from sales of cattle,[5] from the rental of the houses on the Maple Row properties, and from tobacco allotments. The ledgers also recorded as "income" certain cash transfers from other bank accounts controlled by petitioners, including accounts used for Dr. Burrus's medical practice and a shopping center owned by petitioners. At the end of each year, Mrs. Burrus gave the ledger and checks to petitioners' accountant. Petitioners' accountant prepared petitioners' returns for each of the years in issue. The accountant would check the ledger against the checks, and make inquiries of Mrs. Burrus to prepare the returns. During the years in issue, petitioners did not have financial statements prepared for Maple Row, nor did they seek advice from any outside management or agricultural consultant regarding Maple Row. Petitioners' accountant did not advise petitioners regarding

---

[5] The entries for cattle sales sometimes specified the number and gender of the animals sold and sometimes did not. Where specified, the ledgers in evidence recorded bull sales ranging from $1,847 to $2,100 per bull, and heifer sales at $850 per heifer.

Maple Row's operations.

In addition to their cattle undertaking, petitioners used the Cheatham Property for recreation. The apartment previously noted allowed for overnight visits. There were four or five horses on the property that were ridden occasionally by petitioners and members of their family, but they were not used in Maple Row's operations. Petitioners conducted an annual dove hunt and barbecue for about 50 to 75 guests. Petitioners' children and grandchildren visited the Cheatham Property during the years in issue at intervals ranging from once per month to once per year depending on their proximity. Petitioners' grandchildren would often canoe and fish on a pond located at the Cheatham Property. Since 1997, petitioners have conducted "Camp Papa" for a week each year during which petitioners' grandchildren engage in work and recreational activities around the Cheatham Property.

During the years in issue, Dr. Burrus attended two conventions of the American Hereford Association and showed bulls there. He attended annual meetings of the Western Stock Breeders Convention in Denver, Colorado. He also was a member of the Tennessee Hereford Association during the years in issue and, prior to the years in issue but not during, had shown Hereford cattle at fairs.

For the years in issue, amounts reported[6] by petitioners on Schedules F, Profit or Loss From Farming, of their returns are summarized below:

| Year | Income[1] | Expenses[2] | Profit (Loss) |
|------|-----------|-------------|---------------|
| 1990 | $10,647 | $140,111 | ($129,464) |
| 1991 | 35,459 | 180,563 | (145,104) |
| 1992 | 27,301 | 258,088 | (230,787) |
| 1993 | 44,607 | 304,966 | (260,359) |
| 1994 | 50,792 | 272,622 | (221,830) |
| 1995 | 32,158 | 188,205 | (156,047) |

[1] In addition to livestock sales, includes tobacco allotment income and income from the rental of houses located on the Maple Row properties. The latter income was reported on the "Other income" line of the Schedules F for the years in issue as follows:

| Year | "Other income" - Schedule F |
|------|------------------------------|
| 1990 | $6,910 |
| 1991 | 10,165 |
| 1992 | 9,596 |
| 1993 | 9,720 |
| 1994 | 9,878 |
| 1995 | 9,448 |

[2] Includes amounts reported by petitioners on Schedules F for the years in issue (except as modified by examination adjustments for 1990 and 1991) as mortgage interest, taxes, depreciation, and conservation expenses as follows:

| Year | Mortgage Interest | Taxes | Depreciation | Conservation Expenses |
|------|-------------------|-------|--------------|------------------------|
| 1990 | $45,712 | $6,908 | $29,228 | $6,198 |
| 1991 | 66,148 | 16,392 | 24,970 | 9,852 |
| 1992 | 121,254 | 11,317 | 29,803 | -- |
| 1993 | 147,636 | 9,621 | 24,579 | 9,011 |
| 1994 | 143,809 | 8,431 | 25,489 | -- |
| 1995 | 58,370 | 11,011 | 27,339 | -- |

For 1996 to 1999, petitioners reported the following amounts on Schedules F of their returns or amended returns:

---

[6] The expense amounts described as "reported" for 1990 and 1991 reflect examination adjustments (agreed to or not contested by petitioners) that reduced reported expenses (and resulting losses) in 1990 and 1991 by $300,066 and $161,049, respectively.

| Year | Income[1] | Expenses[2] | Profit (Loss) |
|------|-----------|-------------|---------------|
| 1996 | $29,967 | $190,053 | ($160,086) |
| 1997 | 46,890 | 193,053 | (146,163) |
| 1998 | 61,698 | 220,154 | (158,456) |
| 1999 | 44,621 | 210,005 | (165,384) |

[1] In addition to livestock sales, includes tobacco allotment income and income from the rental of houses located on the Maple Row properties.  The latter income was reported on the "Other income" line of the Schedules F for 1996 to 1999 as follows:

| Year | Other Income - Schedule F |
|------|---------------------------|
| 1996 | $8,506 |
| 1997 | 6,903 |
| 1998 | 9,906 |
| 1999 | 9,720 |

[2] Includes amounts reported by petitioners on Schedules F for 1996 to 1999 as mortgage interest, taxes, depreciation, and conservation expenses as follows:

| Year | Mortgage Interest | Taxes | Depreciation | Conservation Expenses |
|------|-------------------|-------|--------------|-----------------------|
| 1996 | $56,627 | $15,982 | $25,233 | -- |
| 1997 | 61,413 | 11,537 | 22,939 | -- |
| 1998 | 57,454 | 12,309 | 25,860 | -- |
| 1999 | 54,861 | 12,172 | 27,318 | $8,061 |

Petitioners also owned and operated a shopping center in Sumner County, Tennessee, called "Maple Row Center" (MRC) during the years in issue.  MRC's several retail spaces were leased to tenants, and day-to-day operations were managed by a property manager.  MRC was nearly breaking even when petitioners purchased it in 1987, and it was operating at a slight profit by the time of trial.

In the notice of deficiency, respondent determined that the farming activities reflected on petitioners' Schedules F for the years in issue were not activities engaged in for profit and that the reported farm losses therefrom should be disallowed under

section 183. Respondent further determined that petitioners were liable for an addition to tax for untimely filing their 1990 return, and that they were liable for negligence penalties for all the years in issue.

OPINION

I. Section 183

We must decide whether petitioners' undertakings reported on Schedules F during the years in issue constituted an activity not engaged in for profit within the meaning of section 183, as determined by respondent. As a general rule, individuals are allowed to deduct expenses attributable to an "activity not engaged in for profit" only to the extent permitted by section 183(b). Sec. 183(a) and (b). Petitioners contend that the farming activity they reported on Schedules F, consisting primarily of the cattle breeding and sales conducted as Maple Row, was conducted with a profit motive and is not subject to section 183.

A. Single Activity Issue

Determining whether an activity falls within the restrictions of section 183 requires an initial determination of the activity's scope. Respondent has issued regulations on this point, the validity of which petitioners have not challenged. See sec. 1.183-1(d), Income Tax Regs. A taxpayer may be engaged

in several undertakings, each of which constitutes a separate

activity for purposes of section 183, or several undertakings may

constitute a single activity for this purpose.  Id.  The

regulations further state:

> (d) Activity defined.  (1) Ascertainment of
> activity.  * * *  In ascertaining the activity or
> activities of the taxpayer, all the facts and
> circumstances of the case must be taken into account.
> Generally, the most significant facts and circumstances
> in making this determination are the degree of
> organizational and economic interrelationship of
> various undertakings, the business purpose which is (or
> might be) served by carrying on the various
> undertakings separately or together in a trade or
> business or in an investment setting, and the
> similarity of various undertakings.  Generally, the
> Commissioner will accept the characterization by the
> taxpayer of several undertakings either as a single
> activity or as separate activities.  * * *  Where land
> is purchased or held primarily with the intent to
> profit from increase in its value, and the taxpayer
> also engages in farming on such land, the farming and
> the holding of the land will ordinarily be considered a
> single activity only if the farming activity reduces
> the net cost of carrying the land for its appreciation
> in value.  * * *  [Sec. 1.183-1(d)(1), Income Tax
> Regs.; emphasis added.]

The regulations thus provide for delineating activities under

section 183 with a general rule drawing on all facts and

circumstances, and a special rule in the case of land acquired or

held primarily for its appreciation on which farming is also

conducted.  In the latter circumstance, the regulations provide

that the holding of the land and the farming will be considered a

single activity only if the farming activity reduces the net cost

of carrying the land. Determining whether the special rule in the regulations is applicable requires a finding of the primary purpose for acquiring or holding the land. Engdahl v. Commissioner, 72 T.C. 659, 668 n.4 (1979); Perry v. Commissioner, T.C. Memo. 1997-417; Hoyle v. Commissioner, T.C. Memo. 1994-592.

Based largely on Dr. Burrus' own testimony and also on the objective evidence, we are persuaded that petitioners held the Maple Row land (i.e., the Cheatham, Robertson, and Sumner Properties) during the years in issue primarily with the intent to profit from the increase in the land's value. Dr. Burrus testified that "if I was going to make a profit related to this [i.e., Maple Row], it was because of the land rather than the herd, the cattle." Further, Dr. Burrus testified specifically to his interest in land as an investment:

> I'm not really into asset-buying, other than buying
> land. * * * I'm sort of like stocks like I am land.
> If I buy them, I just let them sit, so I - I don't sell
> them unless there's some reason.

With respect to the Maple Row land, Dr. Burrus testified that he "was pretty sure it was going up in price" during the years in issue, and appraisals obtained by petitioners support the view that the properties were appreciating substantially. Moreover, Mrs. Burrus reported her occupation for the years in issue as "real estate manager".

That Dr. Burrus's <u>primary</u> profit motive during the years in issue was based on land appreciation rather than the cattle operation is also reflected in his actions with respect to FBHR. Although Dr. Burrus's disenchantment with FBHR's cattle breeding operations caused him to seek to reduce his share of the partnership's profits and losses from 50 percent to 20 percent, he nonetheless was careful to retain his 50-percent interest in the partnership's land. At the dissolution of FBHR, the partners agreed that Dr. Burrus would receive only 20 percent of the cattle and other assets <u>except</u> the land. With respect to the land, Dr. Burrus had the option of either selling his half interest or buying Dr. Foreman's, based on Dr. Foreman's appraisal. Dr. Burrus opted to buy, even though a half interest in the Cheatham Property had nearly tripled in value during the partnership's ownership, from approximately $300,000 to over $800,000.

Dr. Burrus's own statement of his profit expectations regarding the Maple Row land and the significance of the cattle herd thereto, his expressed interest in land as an investment, his wife's description of her occupation as "real estate manager", and his actions with respect to the FBHR partnership all point convincingly to the conclusion that he held the land utilized in Maple Row's operations primarily with the intent to

profit from its appreciation rather than for purposes of conducting the cattle activity. It follows that the land was "held primarily with the intent to profit from increase in its value" during the years in issue, within the meaning of the regulations. Sec. 1.183-1(d)(1), Income Tax Regs.[7]

Since petitioners held the Maple Row land primarily with the intent to profit from its appreciation, the holding of the land and the farming activities are considered a single activity under the regulations only if the farming activity reduces the cost of holding the land. Id. The regulations further provide:

> the farming and holding of the land will be considered
> a single activity only if the income derived from
> farming exceeds the deductions attributable to the
> farming activity which are not directly attributable to

---

[7] While there is evidence in the record that the Cheatham Property was originally acquired by FBHR primarily for a cattle activity (because of its proximity to Drs. Foreman's and Burrus's medical practices), the regulations provide for separate activity treatment of landholding and farming whenever the land "is purchased or held" primarily for its appreciation. Sec. 1.183-1(d)(1), Income Tax Regs. (Emphasis added.) We are persuaded by his testimony and actions that by 1990 and the remaining years in issue, Dr. Burrus was holding the Cheatham Property primarily for its appreciation. With respect to the Robertson and Sumner Properties, the record contains no evidence of Dr. Burrus's intentions at the time of the acquisition of those properties, although farming activities on the properties were reported on certain of petitioners' returns before the years in issue. However, Dr. Burrus's testimony concerning his intentions during the years in issue was directed at all three properties utilized in the Maple Row operations, and persuades us that the Robertson and Sumner Properties were likewise held primarily for their appreciation potential during the years in issue.

the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of the improvements to the land). [Id.]

Applying the foregoing regulation in this case, we conclude that the "income derived from farming" includes all income reported by petitioners on their Schedules F except the amount listed on the "Other income" line, which the testimony of both Dr. and Mrs. Burrus confirms is income petitioners received from renting three houses located on the Maple Row land. Such income is more appropriately allocable to the holding of land. As for deductions "directly attributable to the holding of the land" that should be excluded from farming deductions, we conclude, based in part on the parties' agreement,[8] that the amounts reported on the Schedules F for mortgage interest, taxes, and

---

[8] Petitioners offered into evidence a table indicating, and further argued on brief, that the Schedule F, Profit or Loss From Farming, entries reported for mortgage interest, taxes, depreciation, and conservation expenses are properly allocable to the holding of land, while respondent concedes on brief that all of the foregoing items except conservation expenses are so allocable. Given respondent's concession regarding depreciation, we do not consider whether the record supports any allocation of some portion of the depreciation (e.g., for equipment) to the farming activity.

Respondent further concedes on brief that the expenses treated as directly attributable to the holding of the land for purposes of sec. 1.183-1(d)(1), Income Tax Regs., are deductible by petitioners, subject, in the case of the mortgage interest, to the restrictions of sec. 163(d).

depreciation are directly attributable to the holding of the land and therefore should be excluded when determining whether the income from farming exceeds the deductions therefrom. The parties disagree regarding the treatment of the conservation expenses reported on the Schedules F, petitioner and respondent contending that they are attributable to landholding and farming, respectively. Since a precondition for the current deduction of a conservation expenditure is that the taxpayer be engaged in the business of farming, see sec. 175(a), we agree with respondent and conclude that the conservation expenses are not directly allocable to the land for purposes of section 1.183-1(d)(1), Income Tax Regs.

Excluding the Schedule F "Other income" from income and the Schedule F deductions that are "directly attributable to the holding of the land", petitioners' "income derived from farming" and "deductions attributable to * * * farming" within the meaning of section 1.183-1(d)(1), Income Tax Regs., during the years in issue are as follows:

| Year | Income Derived From Farming | Deductions Attributable To Farming | Net Gain (Loss) |
|------|-----|-----|-----|
| 1990 | $3,737 | $58,263 | ($54,526) |
| 1991 | 25,294 | 73,053 | (47,759) |
| 1992 | 17,705 | 95,714 | (78,009) |
| 1993 | 34,887 | 123,130 | (88,243) |
| 1994 | 40,914 | 94,893 | (53,979) |
| 1995 | 22,710 | 91,485 | (68,775) |

Since petitioners' income derived from farming did not exceed the deductions attributable thereto in any of the years in issue, their farming activity--i.e., the Maple Row cattle activity--must be treated as a separate activity from the holding of land, in accordance with section 1.183-1(d)(1), Income Tax Regs.

Respondent concedes that petitioners' separate activity of holding land was an investment activity for which the allocable expenses are deductible. (See supra note 8.) It therefore remains for us to decide whether petitioners' separate activity of farming (i.e., as disaggregated under section 1.183-1(d)(1), Income Tax Regs., from the activity of holding land) was an activity not engaged in for profit within the meaning of section 183.

B. Application of Section 183 to Cattle Activity

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under

paragraph (1) or (2) of section 212." In general, deductions are allowable under sections 162 or 212 for activities in which the taxpayer engaged with the primary purpose and dominant hope and intent of realizing a profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989), affg. T.C. Memo. 1988-310; Novak v. Commissioner, T.C. Memo. 2000-234. "An activity is engaged in for profit if the taxpayer entertained an actual and honest, even though unreasonable or unrealistic, profit objective in engaging in the activity." Campbell v. Commissioner, 868 F.2d 833, 836 (6th Cir. 1989), affg. in part, revg. in part and remanding T.C. Memo. 1986-569; Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.

Whether the taxpayer engaged in an activity with the requisite profit objective is a question of fact to be determined by examining all the facts and circumstances, giving greater weight to objective facts than to the taxpayer's mere statement of intent. Engdahl v. Commissioner, 72 T.C. at 666; sec. 1.183-2(a), Income Tax Regs. The taxpayer bears the burden of proving the requisite profit objective. See Rule 142(a); Hayden v. Commissioner, supra at 1552; Golanty v. Commissioner, 72 T.C.

411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).[9]

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. Campbell v. Commissioner, supra at 836. These factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. As no single factor is controlling, the facts and circumstances of the case taken as whole are determinative. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.

As a threshold matter, we must consider Dr. Burrus's

_____

[9] Sec. 7491 is inapplicable in these proceedings; the parties conceded at trial that the examinations in this case commenced before July 22, 1998, the statute's effective date.

previously quoted testimony to the effect that any profit he expected to make from Maple Row "was because of the land rather than the herd".  Taken in context, we do not interpret Dr. Burrus's statement as a concession that he had no profit intent with respect to the cattle activity.  Dr. Burrus's observations were directed at Maple Row as a whole--that is, both the landholding and the cattle activity as an integrated undertaking. In this context, Dr. Burrus's statement reflected his judgment that any profits from the cattle operation would never be sufficient to cover the cost of holding the land.  As he stated in the same context:

> I wasn't worrying about making a profit from selling
> the cows in the magnitude of [$]230,000 [the 1992 loss,
> including land costs] * * * [Neither] Dr. Foreman nor I
> ever made any profit [from cattle] that would
> counteract the cost of the land.

Thus, we understand Dr. Burrus as expressing the view that, because his land costs would dwarf what he considered to be the realistic profit potential of the cattle operation, any overall gain from the integrated undertaking would come from land appreciation.  However, where, as here, the landholding and cattle breeding activities must be analyzed separately under section 183, we do not consider Dr. Burrus's comments directed at the <u>combined</u> results of landholding and cattle breeding activities as a concession that petitioners lacked a profit

motive with respect to the cattle breeding activity considered separately.

We accordingly proceed to consider whether petitioners had an actual and honest intent to profit from the cattle activity, based on the factors enumerated in the regulations.

### 1. Manner in Which Activity Conducted

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. See sec. 1.183-2(b)(1), Income Tax Regs. Also, a profit motive may be indicated by the conduct of the activity in a manner substantially similar to other activities of the same nature which are profitable. Id. Both parties proffered expert witnesses on cattle breeding to evaluate the conduct of Maple Row's cattle operations.[10]

---

[10] With regard to the parties' cattle breeding experts:

> We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'" We are not bound by the formulae and opinions proffered by an expert, especially when they are contrary to our own judgment. Instead, we may reach a decision based on our own analysis of all the evidence in the record. The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based. While we may accept the opinion of an expert in its entirety, we may be selective in the use of any portion of such an opinion. We also may reject the opinion of an
> (continued...)

Petitioners did not have a written business plan, nor did they prepare income or budget projections with respect to the activity. However, petitioners contend that Dr. Burrus believed the cattle activity would begin to show a profit once the herd reached approximately 100 purebred productive cows and that he was endeavoring towards that goal. Respondent disputes petitioners' contention that they were endeavoring to achieve a herd of 100 cows, citing among other things the absence of records documenting the size of petitioners' herd for the years in issue.

We agree with respondent that it is not possible to determine the size of petitioners' herd during the years in issue from the herd inventory records in evidence.[11] This is so

---

[10](...continued)
expert witness in its entirety. [Alumax, Inc. v. Commissioner, 109 T.C. 133, 171-172 (1997), affd. 165 F.3d 822 (11th Cir. 1999); citations omitted.]

As best we can ascertain from their reports, the parties' cattle breeding experts were provided data on petitioners' cattle operation that was more limited than what has been introduced as evidence in these proceedings. In a few instances, the experts appear to have been provided information that is not in the record. In any event, their failure to analyze certain of the years in issue detracts significantly from the usefulness of their testimony. As a result, to the extent we have not specifically mentioned their testimony, we have found it unhelpful, unpersuasive, or both.

[11] The parties' cattle experts provided herd figures for certain years in their reports, apparently based in part on

(continued...)

because these records document births, but not sales,[12] deaths or
other dispositions. Nonetheless, petitioners' herd inventory
records do show, and the parties agree, that petitioners' cattle
produced the following purebred Hereford offspring during the
years in issue:

| Year | Heifers | Bulls | Total |
|------|---------|-------|-------|
| 1990 | 13 | 6 | 19 |
| 1991 | 10 | 7 | 17 |
| 1992 | 15 | 15 | 30 |
| 1993 | 17 | 20 | 37 |
| 1994 | 27 | 24 | 51 |
| 1995 | 30 | 23 | 53 |

Thus, the number of offspring produced by petitioners' herd
nearly doubled in the first 4 years of operation and nearly

---

[11](...continued)
information that was not offered into evidence. Our review of
those figures indicates that they are either incomplete or
unreliable.

Petitioners' expert provided figures only for 1990 through
1992. Respondent's expert covered 1990 through 1992, and 1994,
but not 1993 or 1995. Respondent's expert's figure for
productive cows in 1994 is highly suspect, however; he puts it at
49, based on records made available to him, whereas the parties
have agreed that births registered in 1994 totaled 51. The
registration of 51 newborn calves in 1994 indicates that there
were almost certainly more than 49 productive cows in that year,
as it is undisputed that the "drop" rate (i.e., calving rate) for
such cows was between 80 and 90 percent. We therefore conclude
that respondent's expert's herd figures are unreliable.

[12] The financial ledgers maintained by Mrs. Burrus for Maple
Row record the proceeds from cattle sales but generally do not
record the number or type of cattle sold.

tripled by the end of the sixth year. It is also undisputed that the "drop" rate--i.e., calving rate--for petitioners' cows was generally between 80 and 90 percent.[13] Consequently, the number of productive cows was clearly growing, suggesting the retention of female offspring for this purpose. Accordingly, petitioners' claim that they were building a herd during the years in issue finds substantial corroboration in the herd inventory records they maintained. In addition, Dr. Burrus's claim that he anticipated being able to sell purebred horned Hereford bulls for approximately $2,000 is substantiated in the financial ledgers, which record sales of bulls at prices in this range.

In short, the business plan claimed by petitioners is corroborated in the records they maintained. The herd inventories were also adequate to document the herd's productivity, to an extent sufficient to earn recognition from the AHA. Two of petitioners' cows earned AHA awards based on productivity in 1998; since the awards were based on the cows' production of nine and six calves respectively, it is clear that petitioners' records extending back into the years in issue were considered reliable and accurate by the AHA. Cf. Stonecipher v. Commissioner, T.C. Memo. 2000-378 (section 183 applicable to

_____

[13] Both Dr. Burrus and respondent's expert testified that calving rates in this range were the norm.

cattle breeding activity where no cattle inventory records kept).

Similarly, with respect to the financial ledgers for Maple Row maintained by Mrs. Burrus, we find that these records, though not flawless, represented a reasonably accurate attempt to record the activity's financial results. Moreover, petitioners maintained separate bank accounts for the purpose of conducting Maple Row's affairs. When cash was transferred from personal or other accounts to Maple Row's accounts, the transfer was recorded in the ledgers. Cf. id. (no separate bank account for cattle activity).

Respondent's expert postulated several criteria to which he believed a profit-oriented purebred cattle breeding operation would adhere, and found Maple Row's practices at variance with those criteria. To the extent the expert's testimony was intended to show that petitioners conducted their cattle breeding activity in a manner not substantially similar to like activities conducted for profit, we are unpersuaded. Respondent's expert cited the need for genetically superior stock, but then opined merely that he was unable to determine from the records provided him whether petitioners had such stock. In this regard, it is worth noting that the expert cited in his report petitioners' documentation to the effect that Maple Row had received the designation "1998 Top Recorders in Tennessee" for having

registered 62 Hereford cattle.  However, respondent's expert does not further discuss this reference, suggesting to us that his report lacked either thoroughness or objectivity.  Respondent's expert further testified that embryo transfer would have been used in a profitable operation, whereas petitioner's expert testified that a switch from embryo transfer to natural selection in 1990 would have been a valid business decision at the time, given the then high cost of embryo transfer.  Finally, respondent's expert postulated that for-profit purebred cattle breeding operations would be conducted at a well maintained, aesthetically pleasing farm site that would conform to the expectations of customers visiting the site for on-site purchases.  The expert found Maple Row's facilities deficient in this respect and also believed that a for-profit operation would engage in advertising to attract such on-site customers.  In fact, Maple Row sold its cattle by means of off-site auctions, obviating the need for advertising, and the prices petitioners obtained at auction were in line with what respondent's expert indicated were market prices.  In sum, we are not persuaded that Maple Row's variances from the model cattle operation postulated by respondent's expert suggest a lack of profit motive.

Overall, we are persuaded that petitioners conducted their cattle breeding activity in a businesslike manner and maintained

adequate records, which in accordance with section 1.183-2(b)(1), Income Tax Regs., tends to indicate the existence of an intent to make a profit.

2. Expertise of Taxpayer and Advisers

Preparation for an activity by extensive study or consultation with experts may indicate a profit objective where the taxpayer conducts the activity in accordance with such study or advice. See sec. 1.183-2(b)(2), Income Tax Regs. A taxpayer need not make a formal market study before engaging in an activity but should undertake a basic investigation of the factors that would affect profit. Westbrook v. Commissioner, T.C. Memo. 1993-634, affd. 68 F.3d 868 (5th Cir. 1995). Expertise with respect to the mechanics of an activity can be distinguished from expertise in the economics of such activity, and the taxpayer's failure to obtain expertise in the economics of the activity in question may indicate a lack of profit objective. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523.

Between the two of them, Dr. Burrus and Mr. Gruen possessed substantial experience with respect to breeding and caring for cattle. While neither Dr. Burrus nor Mr. Gruen had formal training regarding the economics of operating a profitable cattle breeding business, both of them had been around cattle breeding

operations for the better part of their lives.  We are persuaded that Dr. Burrus's near lifelong experience with farming, including livestock, gave him knowledge of both the mechanics and economics of livestock.  In accordance with section 1.183-2(b)(2), Income Tax Regs., the expertise possessed by Dr. Burrus and his hired help tends to indicate the existence of a profit intent.

### 3.  Time and Effort Expended

The fact that the taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate a profit objective.  Sec. 1.183-2(b)(3), Income Tax Regs.  The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.  Id.

Dr. Burrus often worked 7 days a week for 10 to 12 hours per day during the years in issue, and petitioners traveled to Africa to work at the mission hospital for approximately 2 months of each year, thereby limiting the amount of time they were able to personally devote to the cattle activity.  Nonetheless, they hired Mr. Gruen, whose experience and competence have been

previously noted, full time to oversee the operations of the cattle activity. The record establishes that Dr. Burrus devoted significant time to consulting with Mr. Gruen in connection with decisionmaking for Maple Row, notwithstanding the demands of his medical practice. When one adds to the foregoing the fact that raising cattle generally lacks significant recreational aspects,[14] the application of section 1.183-2(b)(3), Income Tax Regs., tends to suggest the existence of a profit objective.

### 4. Expectation That Assets May Appreciate

An expectation that assets used in the activity will appreciate in value may indicate a profit objective. Golanty v. Commissioner, 72 T.C. at 427-428; Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); Hillman v. Commissioner, T.C. Memo. 1999-255; Dodge v. Commissioner, T.C. Memo. 1998-89, affd. 188 F.3d 507 (6th Cir. 1999); sec. 1.183-2(b)(4), Income Tax Regs. We have held at respondent's behest that petitioners' landholding and cattle activities must be treated as separate activities under section 1.183-1(d)(1), Income Tax Regs., for purposes of section 183.

---

[14] As more fully discussed in connection with the "recreation" factor, the recreational aspects of the Cheatham Property that find support in the record are more closely associated with petitioners' landholding activity than with their cattle activity.

As a consequence, any anticipated appreciation in the Maple Row land is not considered in ascertaining the existence of an intent to profit from the cattle activity. See <u>Roberts v. Commissioner</u>, T.C. Memo. 1987-404; <u>Hambleton v. Commissioner</u>, T.C. Memo. 1982-234. With respect to the livestock, we have previously found that petitioners' purebred herd was growing during the years in issue, and that they were breeding bulls that sold for approximately $2,000 each. These factors indicate that petitioners had an expectation that the herd would appreciate; under section 1.183-2(b)(4), Income Tax Regs., this expectation tends to indicate the existence of an intent to profit.

### 5. <u>Past Success in Similar or Dissimilar Activities</u>

A taxpayer's past success in similar or dissimilar activities may indicate that his engagement in a presently unprofitable activity is for profit. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioners have enjoyed at least moderate success with MRC, Dr. Burrus has been successful in his medical practice, and the missionary hospital he established in Africa is still operating. Petitioners' prior experience with cattle breeding at FBHR was unsuccessful, at least if the appreciation in the value of the Cheatham Property during that period is disregarded. If the more than doubling in value of the Cheatham Property during the period it was held by the FBHR partnership is taken into

account, Dr. Burrus's actions involving the partnership--reducing his exposure to the operational losses while holding onto his full interest in the land--appear financially astute.  On balance, given the generally positive track record of Dr. Burrus's various entrepreneurial undertakings, we believe that the application of section 1.183-2(b)(5), Income Tax Regs., provides support for the existence of an intent to profit.

6.  Activity's History of Income or Losses

An activity's history of income or loss may reflect whether the taxpayer has a profit objective.  Sec. 1.183-2(b)(6), Income Tax Regs.  Unless explained by unforeseen or fortuitous circumstances beyond the taxpayer's control, a record of continuous losses beyond the period customarily required to obtain profitability may indicate that the activity is not engaged in for profit.  Golanty v. Commissioner, supra at 426; Bessenyey v. Commissioner, supra at 274; Hillman v. Commissioner, supra; sec. 1.183-2(b)(6), Income Tax Regs.

As earlier calculated for purposes of determining whether petitioners' farming activity should be treated as a separate activity from the holding of land, the results from petitioners' Maple Row cattle activity for the years in issue are as follows:

| Year | Income Derived From Farming | Deductions Attributable To Farming | Net Gain (Loss) |
|------|------|------|------|
| 1990 | $3,737 | $58,264 | ($54,527) |
| 1991 | 25,294 | 73,053 | (47,759) |
| 1992 | 17,705 | 95,715 | (78,010) |
| 1993 | 34,887 | 123,130 | (88,243) |
| 1994 | 40,914 | 94,893 | (53,979) |
| 1995 | 22,710 | 91,484 | (68,774) |

For the 4 years immediately following the years in issue, if the same adjustments are made to show the results of the Maple Row cattle activity as a separate activity, those results are as follows:

| Year | Income Derived From Farming | Deductions Attributable To Farming | Net Gain (Loss) |
|------|------|------|------|
| 1996 | $21,461 | $92,211 | ($70,750) |
| 1997 | 39,987 | 97,164 | (57,177) |
| 1998 | 51,792 | 124,531 | (72,739) |
| 1999 | 34,901 | 115,654 | (80,753) |

Thus, petitioners have shown losses for the first 6 years of Maple Row's operations (the years in issue), as well as the next 4 years.

Petitioners point out that courts have recognized a startup period with respect to breeding activities that is longer than the period associated with other activities, and argue that their losses have been incurred during a startup period. See, e.g., Engdahl v. Commissioner, 72 T.C. at 669 (startup phase between 5 to 10 years for horse-breeding activity); Fields v. Commissioner,

T.C. Memo. 1981-550 (losses in third, fourth, and fifth years of cattle breeding operation found to occur during startup phase).

Petitioners' losses throughout the first 6 years of Maple Row's operations are consistent with Dr. Burrus's stated business plan of expanding his herd of productive cows to 100, and not expecting to cover his losses until that time. As previously discussed, petitioners' records and other evidence corroborate that they were building a herd during the years at issue. Indeed, the herd's annual production of registered purebred offspring nearly tripled during the period. Although petitioners incurred losses during all 6 years in issue, we are persuaded that these years constituted a reasonable startup period. As a result, the continuous losses do not indicate the absence of an intent to profit, under section 1.183-2(b)(6), Income Tax Regs. While petitioners also incurred losses for the next 4 years (1996-99), the issue we must decide is whether they had an actual and honest intent to profit during the years in issue, given their herd growth and other factors extant at the time; petitioners' intentions and expectations for the years in issue were not informed by the experience of subsequent years.[15]

---

[15] We express no opinion herein whether petitioners were engaged in their cattle activity for profit during 1996 through 1999, given the facts and circumstances known to them in those

(continued...)

7.  Occasional Profits

The amount of any occasional profits, if large in relation to losses incurred or the taxpayer's investment, may indicate a profit objective.  Sec. 1.183-2(b)(7), Income Tax Regs.  The possibility of a substantial profit in a highly speculative venture may indicate a profit objective even where profits are occasional and small or nonexistent.  Id.

As petitioners have shown no profit during any year of the Maple Row cattle activity, this factor is neutral.

8.  Taxpayer's Financial Status

Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved.  Sec. 1.183-2(b)(8), Income Tax Regs.

During each of the years in issue, Dr. Burrus earned substantial income from his medical practice, which obviously made it possible for petitioners to bear the losses incurred in connection with the cattle activity.  However, recreational elements, which "especially" suggest the absence of a profit

---

[15](...continued)
years.

motive where substantial other income is available, were insignificant with respect to petitioners' cattle activity.[16] On balance, we do not believe this factor carries much weight in the instant case.

### 9. Personal Pleasure or Recreation

The existence of recreational or personal elements in an activity may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. On the other hand, where an activity lacks any appeal other than profit, a profit objective may be indicated. Id. Respondent cites several examples of recreational activities petitioners undertook on the Cheatham Property including, inter alia, fishing in the ponds, horseback riding, the annual dove hunt, and Camp Papa, to argue that Maple Row's recreational elements were significant and should evidence a lack of profit motive. The recreational elements respondent cites are more appropriately allocable to the landholding activity than the cattle activity, in our view. Moreover, petitioners did not maintain a residence at any of the Maple Row properties, and any personal or recreational aspect of the apartment available for their use at the Cheatham Property is likewise allocable to the landholding. While Dr. Burrus had an

---

[16] See discussion of the "recreation" factor, infra.

avocational interest in Hereford breeding, as evidenced by his attendance, and occasional showing of animals, at livestock conventions and fairs, we believe any recreational component of these activities was minor. Cf. Sullivan v. Commissioner, T.C. Memo. 1998-367 (taxpayer's regular participation as nonprofessional rider in cutting horse competitions constitutes recreation indicative of lack of profit motive), affd. without published opinion 202 F.3d 264 (5th Cir. 1999). Because petitioners' cattle activity lacked significant recreational appeal, a profit intent is indicated under section 1.183-2(b)(9), Income Tax Regs.

C. Conclusion

Petitioners' purebred Hereford herd grew significantly during the first 6 years of Maple Row's operation, the years at issue herein. Their herd inventory records document this herd building process. While losses were incurred in all 6 years, such losses are consistent with a startup period inherent in herd building and therefore do not necessarily indicate a lack of profit motive. Given the growth in petitioners' herd as of 1995, the demonstrated market value of purebred Hereford bulls, their record keeping practices, and the absence of significant recreational elements in cattle raising, we are persuaded that petitioners had an actual and honest intent to profit from their

cattle activity during the years in issue.  Accordingly, respondent's determination to disallow the losses attributable to petitioners' cattle activity under section 183 is not sustained.

II.  Addition to Tax for Failure To File Timely Under Section 6651 and Accuracy-Related Penalties Under Section 6662

Respondent determined that petitioners are liable for the section 6651(a) addition to tax for failing to file a timely return for 1990.  This addition to tax does not apply if the taxpayer proves that the failure to file timely was:  (1) Due to reasonable cause, and (2) not due to willful neglect.  Sec. 6651(a)(1); Rule 142(a)(1); United States v. Boyle, 469 U.S. 241 245 (1985); Peacock v. Commissioner, T.C. Memo. 2002-122.

There is no dispute that the due date for petitioners' 1990 return was October 15, 1991, and that it was received on October 28, 1991.  Petitioners argue that they had reasonable cause for untimely filing because they relied on their accountant to file their return.  Reliance on an agent, however, does not constitute reasonable cause for a late filing under section 6651(a)(1). United States v. Boyle, supra at 252; Stolz v. Commissioner, T.C. Memo. 1999-404.  In the absence of any other argument or evidence establishing reasonable cause, we sustain respondent's determination under section 6651(a)(1) for 1990; petitioners conceded various adjustments for that year which would result in a deficiency, in addition to any deficiency resulting from our

holdings herein.  See sec. 6665(b)(1).

Respondent also determined that, for each of the years in issue, petitioners are liable for the section 6662(a) accuracy-related penalty due to their negligence or intentional disregard of rules or regulations.  For this purpose, negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard of rules or regulations.  Sec. 6662(c); sec. 1.6662-3(b), Income Tax Regs. The accuracy-related penalty does not apply to any portion of an underpayment to the extent the taxpayer shows there was reasonable cause for such portion and that the taxpayer acted in good faith.  Sec. 6664(c)(1); secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs.  The decision as to whether a taxpayer acted with reasonable cause and in good faith depends on all the facts and circumstances relevant to the case with the most important factor being the taxpayer's efforts to assess the proper tax liability.  Jorgenson v. Commissioner, T.C. Memo. 2000-38; sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners treated the entire Maple Row cattle undertaking as one activity.  Portions of the underpayments that may remain for the years in issue may be attributable to petitioners' failure to treat as a separate activity the holding of the land

on which they conducted their cattle activity.[17]  With respect to those portions, we find that petitioners had reasonable cause for the underpayment.  We have found that petitioners conducted their cattle activity with the requisite profit motive to avoid the restrictions of section 183.  In these circumstances, their failure to adhere to the precise requirements of the regulations requiring the treatment of farming and landholding as separate activities does not, in our view, reflect a lack of effort to assess their proper tax liability.

As for any remaining portions of the underpayments for the years in issue, such as those attributable to petitioners' failure to substantiate claimed deductions, petitioners have not addressed the issue, and we accordingly sustain respondent's determinations.

In light of the parties' concessions and the foregoing,

Decision will be entered under Rule 155.

---

[17] For example, underpayments may exist as a result of the limitations imposed by sec. 163(d) on the mortgage interest deductions claimed by petitioners on Schedules F.